### Olney Loan and B. Association v. H. C. Rush et al.

1. BUILDING AND LOAN ASSOCIATIONS—*Release of Mortgages by Officers Without Authority of Law.*—A release of a mortgage given by a borrower to a building and loan association, executed by its officers fraudulently and without authority to do so, is not binding upon the association.

2. CORPORATIONS—*Execution of Deeds By.*—The technical mode of executing the deed of a corporation, is for the proper officer to sign the corporate name to it, adding his signature and official title as agent by whom the act is done and affixing the corporate seal, which should be affixed by a duly authorized officer or agent.

Bill of Foreclosure.—Appeal from the Circuit Court of Richland County; the Hon. ENOCH E. NEWLIN, Judge, presiding. Heard in this court at the August term, 1901. Reversed and remanded with directions. Opinion filed September 4, 1901.

JOHN LYNCH, JR., attorney for appellant.

H. G. MORRIS, attorney for appellees.

MR. JUSTICE BIGELOW delivered the opinion of the court.

Appellant is a corporation organized and doing business under the laws of this State.

On the 16th of May, 1896, Harry C. Rush borrowed of appellant $600, and on that date Rush (his wife, Anna, joining with him) executed their promissory note to appellant

for said sum, payable eight years after date, with interest as stated in the note, " at the rate of seven-twelfths of one per cent per month, payable monthly, also all monthly dues and fines on six shares of the capital stock of said association."

On the same date of the note and to secure it, Rush and wife mortgaged directly to appellant lot 41 of C. S. & C. Mace's first addition to Olney; and on that date, Harry C. Rush became a stockholder in the association, taking and carrying six shares of the stock.

On April 27, 1897, Rush sold and assigned his stock to appellee Charles Quick, and at the same time Rush and wife sold and conveyed the mortgaged property to Quick, who assumed to pay the mortgage debt, and thereafter, until April 15, 1899, Quick paid the dues, interest and premium as provided by the by-laws of the association. On that date and for years prior thereto, Charles S. Mace was the secretary, and for a portion of the time was the legal solicitor of the association, and while acting as such on the last named date, Quick contracted with Mace to sell a farm which he owned to Mace, for $4,000, and Mace gave his two notes for $1,500 each, due in five and ten years, respectively, and also gave Quick five shares of stock in the Linden Lawn Farming Company, valued in the trade at $500, and for the remaining $500, Mace drew his check to Quick on the First National Bank of Olney and handed it to Quick, who immediately handed it back to Mace. Quick gave Mace a bond for a deed of the farm.

When the check was drawn Mace had to his credit in the bank $154.15, and the assistant cashier of the bank testified that he presumed the check would have been paid if it had been presented, but there was no special arrangement between Mace and the bank whereby Mace's checks were cashed.

When Quick handed the check back to Mace, Mace immediately went to the court house and released, in his own name, the mortgage on the record, and after stamping the mortgage " Paid," handed it to Quick. The note secured

by the mortgage was not canceled nor delivered to Quick, but remained in possession of appellant and was carried on its books as an asset of the association.

Early in March, 1899, Mace was discovered to be a defaulter to the loan association of over $50,000 and committed suicide.

After the death of Mace, Quick made an arrangement with the administrator of Mace's estate, whereby he surrendered the two $1,500 notes and turned back to the estate the five shares of stock in the Linden Lawn Farming Company, and Mace's estate surrendered to Quick, the bond for a deed of the farm, given to Mace; Quick however, did not return to the estate the $500, or any part of it.

This suit was brought by appellant to foreclose the mortgage, the bill, beside the usual allegations for such purpose, charging the invalidity of the release by reason of fraud, and because Mace had no power from the board of directors of the association to execute it. Quick answered the bill, denying the charges of fraud and set up the transaction between himself and Mace, insisting that Mace had authority to execute the release on the ground that for many years he had executed releases in the same manner the release in this case was made, without being forbidden by the board of directors of the association. Replication was filed to the answer, and the cause was heard on oral testimony in open court, and at the conclusion of the evidence, Rush and wife were dismissed out of the case, and the court dismissed the bill for want of equity, and the record of the case is brought here on the appeal of the loan and building association.

The errors assigned bring for review the order of the court in dismissing the bill.

As to the contention of appellant that the release was conceived in fraud, the principal, if not the only party who conceived and attempted to carry out the fraud being dead, we prefer to let that matter rest, without expressing any opinion concerning it further than may become necessary in the proper determination of the case.

Appellee does not contend that appellant actually got the money due to it on the mortgage, but rests his entire defense upon that portion of the transaction of the sale by appellee of his farm, and the purchase of it by Mace, wherein Mace drew his check on the bank for $500 and handed it to appellee who at once handed it back to Mace, thus making the delivery and redelivery but one transaction, which amounted to no delivery at all to Quick. This conclusion is fully sustained by appellee himself, who testified in chief as follows:

"Q. Now go on and state the transaction of paying off this mortgage. A. When we closed the deal Mr. Mace wrote out a check for $500; I said, I don't want the money, I want to pay off the mortgage on the Rush property, and shoved the check back and he went over to the court house and canceled the record and came back and said he had released the mortgage; and I have got it in my hand or pocket now."

It seems too clear for argument that no actual or claimed potential money was transferred from Mace to Quick, and if there was none how could any have passed from Quick to Mace. The transaction in its nakedness was a sale of Quick's farm to Mace, and a part of the purchase price of the farm was, that Mace should pay Quick's debt to appellant, which he never did pay; how then can any effect be given to the so-called release, since it is not claimed to be based on any other consideration?

The release which Mace made on the margin of the record of the mortgage is as follows:

"For and in consideration of full payment to the Olney Loan and Building Association of the amount secured by the annexed mortgage, I hereby release and quit-claim to Charles Quick, by whom said payment was made, the premises included in said mortgage, and forever cancel and release and discharge the same of record.

Dated this 18th day of April, A. D. 1899."

(Signed)    "C. S. MACE,
Solicitor Olney Loan and Building Association."

It is evident that this is not a release by appellant and it does not pretend to be.

"The technical mode of executing the deed of a corporation is for the proper officer to sign the corporate name, adding his signature and official title as agent by whom the act is done, affixing the corporate seal. * * * It is essential that the deed on its face should purport to be executed by the corporation, and that its seal should in fact be affixed by a duly authorized officer or agent." Jones on Conveyancing, Vol. 2, Sec. 1048.

We are not to be understood as holding that if appellant held out to its patrons that Mace, either as its secretary or solicitor, was authorized to receive money in payment of mortgages, that it would not be bound by his acts in receiving it, even if after receiving it he embezzled the fund; but that is not this case, because appellee never had the money to pay to Mace, nor did he attempt to get it as he should have done to have made himself safe, before delivering to Mace his bond for a deed of his farm. Appellant had nothing to do with the deal between appellee and Mace, and appellee knew it and was bound to know the law concerning it, and if he did not, the loss, if any he has suffered, must be attributed to his own negligence.

It might have been possible, that if Mace had presented the check to the bank with direction to place the amount to the credit of appellant on the books of the bank, that the directions would have been complied with, and the burden of the fraud placed upon the bank, where it properly belonged, if it was in the habit of allowing its bankrupt customers to overdraw their accounts to such an extent that this check would have overdrawn Mace's account.

Notwithstanding the assistant cashier of the bank testified that, had the check been presented, it would "probably" have been paid, yet, in the absence of any certainty about the matter, courts ought not to rely on conjectural opinions, that what ought not to have been done and was not done, would have been done had an opportunity been given for the doing of it.

Of course we assume (and the evidence warrants the assumption) that Mace was a bankrupt at the time he drew his check and if it be said that the bank did not know it,

the reply is, that before its representative can be believed in saying that the bank would probably have cashed the check had it been presented, it must appear that Mace was good for his overdraft, and there is no pretense that he was.

We are not to be understood as holding that the check would have been a payment of the note, if Mace's account at the bank had shown that he had to his credit funds more than sufficient to have paid the check.

The claim by appellee, that appellant is estopped by the release from foreclosing its mortgage, has no foundation on which to rest. There is no innocent purchaser for value of the mortgaged property, without notice of the mortgage in this case. Nor did appellant know of the trade and arrangement between appellee and Mace by which the mortgage was attempted to be released until long after it was done.

As we view the case, it is unnecessary to advert to the settlement that appellee made with the representatives of Mace's estate, whereby he got back his farm by surrendering Mace's notes, and the stock he received from Mace, in the Linden Lawn Farm Company, while he did not even offer to pay back the money that he claims to have paid to appellant to satisfy the Rush note and mortgage, probably for the reason that he did not believe then Mace had paid him any money on the purchase of the farm, and we thing he was fully justified in that belief.

Appellee, in attempting to give a reason why he did not take up the Rush note when he claims to have paid it, testified as follows:

"The Court: I want to ask Mr. Quick a question or two; I understand you to say that when you got your mortgage back you did not get the note ?"

" A. No, sir."

"Q. He told you he wanted to keep the note and use it as collateral ? A. Yes. He says: ' I want to keep the note for a few days. I might want it for collateral.' I says: ' The note is mine, you have no right to it;' and he started off in a hurry, as he always would and says: ' In a few days you come in and I will give you the note.' I went out and supposed that he was honest, and believed he would."

"Q. Did you tell him he could have the note to use as collateral? A. I went out and never said another word."

From this evidence it is quite clear that appellee consented that Mace should retain and hold the note to be used by him, Mace, as collateral security for his own indebtedness, and accordingly, as Mace knew his check would not be paid (as it never has been), he concluded it was quite unnecessary to go through the form of taking the note, as secretary of appellant, from its office, and formally delivering it to appellee for the mere purpose of having it redelivered to him as secretary by Mace in his own private capacity, therefore he left it in the possession of the association, where the check must have been, according to appellee's theory of the transaction, as collateral security for the payment of the check.

We do not think it necessary, in order to sustain appellant's right to foreclose the mortgage, to adopt the foregoing reasoning, but the facts that lead to the conclusion reached are in the record and are furnished by appellee, and since he consented to the use of the note by Mace as collateral security for Mace's debts generally, we know of no way in which he could have used it, that would have done less injury to appellee than the way indicated.

The decree, dismissing the bill as to appellees Quick and his wife, is reversed, and the cause remanded for further proceedings not inconsistent with the views herein expressed. Reversed and remanded.